The PEOPLE of the State of Colorado, Complainant.

James C. UNDERHILL Jr., Respondent.

No. 12PDJ071.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

June 29, 2015.

---

## ORDER REVOKING PROBATION PURSUANT TO C.R.C.P. 251.7(e)

### I. BACKGROUND AND PROCEDURAL HISTORY

On October 12, 2012, the Court approved a "Stipulation, Agreement and Affidavit Containing the Respondent's Conditional Admission of Misconduct" filed by the People and Cecelia A. Fleischner and Michael T. McConnell, former counsel for Respondent. Under the terms of the stipulation, Respondent was suspended for one year and one day, all but nine months stayed upon the successful completion of a two-year period of probation. The suspension took effect on November 5, 2012. Respondent was reinstated to the practice of law on August 30, 2013, and was placed on a two-year period of probation. The terms of probation included no further violations of the Colorado Rules of Professional Conduct.

On November 6, 2014, the People filed a "Motion to Lift Stay and Impose Sanction Pursuant to C.R.C.P. 251.7(e)," alleging that Respondent violated conditions of his probation by disobeying Colo. RPC 4.2. By order of November 10, 2014, the Court directed Respondent to answer in writing and show cause why the stay on his three-month-and-one-day suspension should not be lifted. After receiving an extension of time, Respondent filed an answer through his then-counsel, Jeffrey S. Pagliuca, on December 14, 2014, and requested a hearing. The People also requested a hearing. The Court set the hearing for April 6, 2015, but it was continued until May 4, 2015, because Respondent had retained new counsel, John S. Gleason and Sara Van Deusen, who needed additional time to review the file.

Prior to the hearing, Respondent filed two motions concerning his inability to serve Kyle and Dina Kopperman with deposition subpoenas and requesting to preclude their testimony at the hearing. The Court denied both motions.[1]

In their instant motion, the People ask the Court to find that Respondent violated the terms of his probation by acting contrary to Colo. RPC 4.2 when he communicated with former clients who were represented by counsel in a defamation suit that he had brought against them. In defense, Respondent asserts that his former clients' counsel had entered a limited appearance pursuant to C.R.C.P. 11(b) and 121 section 1-1(5) and that any communications with his former clients on matters outside that limited appearance were not prohibited by Colo. RPC 4.2.

At the hearing on May 4, 2015, the Court considered testimony from Katayoun Donnelly, Dina Kopperman, Kyle Kopperman, and Respondent.[2] The Court admitted stipulated exhibits 3, 9, 11, 24–25, 27, 30, 34, 38, 40, 42–43, 45, 47, 50–54, 58–61, 63–64, 67–73, 84–86, 90–92, 105, 107, 110–113, 116–117, 119, and 121 and Respondent's exhibits A–B.

As requested by the Court, the People filed written closing arguments on May 11, 2015; Respondent did likewise on May 18. Respondent attached three exhibits to his closing brief: exhibit A, the transcript of the probation revocation hearing, and exhibits B and C, two notices of limited representation filed by an attorney in an unrelated district court case. On May 18, the People filed an objection to exhibits B and C because they were not introduced into evidence at the hearing. In response, Respondent contended that these exhibits are pertinent legal authority. The Court **OVERRULES** the People's objection to these exhibits.

## II. *LEGAL STANDARDS*

C.R.C.P. 251.7(e) permits the People, should they receive information indicating that an attorney may have violated probationary conditions, to file a motion seeking an order requiring the attorney to show cause why the attorney's suspension should not be activated. If either party so requests, the Court shall hold a hearing on the motion.[3] At such a hearing, the People have the burden of establishing any probationary violation by a preponderance of the evidence.[4]

## III. *FINDINGS OF FACT*

The Court considered the testimony of each witness and all admitted exhibits, and finds the following facts were established by a preponderance of the evidence. Where not otherwise indicated, these facts are drawn from testimony provided at the hearing.

### Respondent's Disciplinary History

On November 5, 2012, Respondent was suspended from the practice of law for a period of one year and one day, with nine months to be served and three months and one day to be stayed upon successful completion of a two-year period of probation. Respondent stipulated that he mismanaged his trust and operating accounts, resulting in both the commingling of funds and his use of unearned client funds for personal and business purposes. In addition, Respondent agreed that he failed to diligently represent and to adequately communicate with a client. Respondent admitted that through this conduct, he violated Colo. RPC 1.3, 1.4(a)(3), 1.5(f), 1.15(a) and (c), 1.16(d), 5.1, and 8.4(c). Respondent's two-year probation began on August 30, 2013. As a condition of staying a portion of his suspension, Respondent was to refrain from engaging in any further violation of the Colorado Rules of Professional Conduct.[5]

1. *See* the Court's orders dated April 24 and May 1, 2015.

2. Respondent renewed his standing objection to the Koppermans' testimony at the start of the hearing. The Court overruled Respondent's objection.

3. C.R.C.P. 251.7(e).

4. *Id.*

5. *See* C.R.C.P. 251.7(b) ("The conditions [of probation] . . . shall include no further violations of the Colorado Rules of Professional Conduct.").

## Background

Respondent owns the Neighborhood Law Office ("NLO"), which he opened with his wife in May 2009. NLO specializes in limited representation pursuant to C.R.C.P. 11(b) and 121 section 1–1(5). Ninety-nine percent of NLO's legal work is performed under a limited entry of appearance—i.e., filing documents on behalf of pro se litigants. Respondent testified that NLO has represented approximately five hundred clients per year since opening its doors in 2009. NLO advertises heavily in print and on the radio, television, and the internet.

In July 2012, Dina (formally known as Lori) and Kyle Kopperman hired NLO to represent Mr. Kopperman in a post-decree matter involving his previous wife. Ms. Kopperman, who also had been recently divorced, testified that the couples' credit had been "tarnished" by their divorces and that they were forced to file for bankruptcy. Because their finances were dire, they hired Respondent to assist them in answering requests for interrogatories that were served on Mr. Kopperman in the post-decree matter. At some point, however, the Koppermans became frustrated with NLO's services. In 2012, after Respondent failed to give them an accounting or a refund, the Koppermans contacted the Better Business Bureau and left a review on its website expressing dissatisfaction with NLO. They also posted an unfavorable review of the firm at www.yelp.com.

## NLO's Defamation Lawsuit Against the Koppermans

On October 31, 2013, Joseph A. Sirchio, an associate attorney at NLO, filed a complaint in Denver District Court against the Koppermans on behalf of NLO alleging defamation, corporate disparagement and trade libel, and breach of contract based upon the Koppermans' online reviews ("Denver Lawsuit").[6] Mr. Kopperman thereafter called

Respondent and offered to remove the online reviews in exchange for Respondent withdrawing the complaint. According to the Koppermans, Respondent refused the offer and asked instead to see their financials. When Mr. Kopperman told Respondent that they had no money, he remembers Respondent replying that "everyone has something to take."

On November 18, 2013, the Koppermans answered the complaint pro se, asserting seven counterclaims.[7] NLO filed its initial disclosures on December 16, 2013, claiming actual damages of $400,000.00, punitive damages of three times the actual damages, and attorney's fees of $5,205.00.[8] Respondent arrived at this number by estimating that the Koppermans' negative internet reviews caused NLO to lose approximately 400 clients at $999.00 per average case.[9]

On January 2, 2014, Respondent and the Koppermans, who were acting pro se at the time, exchanged emails discussing possible settlement of the Denver Lawsuit.[10] Respondent proposed to dismiss the complaint in exchange for the Koppermans' removal of all online reviews, their stipulation to a judgment of $100,000.00, and their payment of a $10,000.00 "wage assignment" to satisfy the judgment.[11] Respondent contended that he believed this was a legitimate offer of compromise and that he hoped for a counteroffer. Ms. Kopperman testified that they "absolutely could not pay" this amount of money because of their bankruptcy filing.

Toward the end of January 2014, the Koppermans were referred to attorney Katayoun Donnelly. Donnelly testified that she believed "there was a need for an attorney in this case" because NLO was seeking substantial damages.

On January 29, 2014, Donnelly filed a limited entry of appearance pursuant to C.R.C.P. 11(b) to assist the Koppermans

---

6. Ex. 3. The case was styled *Neighborhood Law Office, P.C. v. Kyle Allen Kopperman and Dina Loreen "Lori" Breedlove Kopperman, individuals,* case number 2013CV34780.

7. Ex. 9 0037–42.

8. Ex. 11 at 0068–69.

9. *See* Ex. 11 at 0069.

10. *See* Ex. 105.

11. Ex. 105 at 0455.

with "filing a motion to dismiss."[12] Donnelly affirmed that in the past she has entered this type of appearance to help clients in need. She believed that a limited appearance was suitable for purposes of disposing of the Denver Lawsuit. According to Donnelly, the Koppermans understood that if they chose to move forward on their counterclaims, they would have to do so pro se. Donnelly stated that over the course of this litigation she never filed a formal pleading modifying her limited appearance because the case never moved past the motion-to-dismiss stage. Ms. Kopperman testified that Donnelly's representation included assisting the couple "from start to finish" on the case. She knew Donnelly would not represent them on the counterclaims because that "would have been another case." Likewise, Mr. Kopperman believed that Donnelly "was brought in to seek dismissal of the Denver case" and that she was their attorney for the Denver Lawsuit.

Also on January 29, Donnelly filed a motion to dismiss NLO's complaint under C.R.C.P. 12(b), arguing that NLO's claims were barred by the statute of limitations.[13] She was ordered by the court to file an amended answer, which she did.[14] The amended answer included one counterclaim for breach of contract.[15]

After the Koppermans' motion to dismiss was fully briefed, NLO filed its own motion on February 13, 2014, voluntarily dismissing its claim for breach of contract.[16] The court

granted this motion on February 24, 2014.[17] Donnelly testified that she viewed the court's order as problematic because it might permit NLO to avoid payment of statutory attorney's fees.[18] She thus sought clarification from the court on its order.

On March 13, 2014, the court issued an order clarifying its earlier ruling.[19] In this order, the court granted the Koppermans' motion to dismiss and dismissed NLO's defamation claim and corporate disparagement and trade libel claim with prejudice.[20] The court then made findings that NLO's breach of contract claim was unconscionable and against public policy.[21] The court ordered the Koppermans to request statutory attorney's fees and costs within fourteen days.[22]

Donnelly testified that after the court granted the Koppermans' motion to dismiss she did not withdraw her limited representation pursuant to C.R.C.P. 121 section 1–1(5), because her task was not yet complete and she believed Respondent was using the legal system to harass the Koppermans.

On March 24, 2014, Donnelly moved to add Respondent to the caption for the purposes of the award of attorney's fees and costs.[23] In the motion, she asked the court to make Respondent personally responsible for the Koppermans' attorney's fees because she was concerned that he would attempt to avoid payment of the fees.[24] Also on March 24, Donnelly filed an affidavit asking for $16,080.00 in fees and costs through March

12. Ex. 27. C.R.C.P. 11(b) and 121 § 1–1(5) permit an attorney to file a limited entry of appearance to assist pro se litigants.

13. Ex. 25.

14. Ex. 24.

15. Ex. 24 at 0102–03.

16. Ex. 34.

17. Ex. 38.

18. *See* C.R.S. § 13–17–201 (2014) ("In all actions brought as a result of a death or an injury to person or property occasioned by the tort of any other person, where any such action is dismissed on motion of the defendant prior to trial under rule 12(b) of the Colorado rules of civil procedure, such defendant shall have judgment for his

reasonable attorney fees in defending the action."); C.R.S. § 13–16–113(2) (2014) ("In all actions brought as a result of a death or an injury to person or property occasioned by the tort of any other person, where any such action is dismissed prior to trial under rule 12(b) of the Colorado rules of civil procedure, the defendant shall have judgment for his costs.").

19. Ex. 42.

20. Ex. 42 at 0200–01.

21. Ex. 42 at 0201.

22. Ex. 42 at 0201.

23. Ex. 43.

24. Ex. 43 at 0203.

13, 2014.[25] Respondent testified that he was generally aware of these filings.

The court held a conference on March 28, 2014. Donnelly appeared for the Koppermans, and Sirchio appeared on behalf of NLO.[26] A trial date for the counterclaim was set at the conference.[27]

On April 17, 2015, Donnelly filed a motion for attorney's fees.[28] Around this time, Sirchio left NLO's employ, and Respondent began representing NLO.[29] Respondent did not object to Donnelly filing the motion for attorney's fees as outside the scope of her limited representation. Indeed, NLO never objected to the reasonableness of Donnelly's fees. Instead, he responded to the motion for attorney's fees on April 17, after attempting to confer with Donnelly.[30] On April 21, the court awarded the Koppermans $16,080.00 in attorney's fees.[31]

On May 8, 2014, the court held another status conference. Respondent appeared for NLO, Donnelly appeared for the Koppermans in defense of the Denver Lawsuit, and Ms. Kopperman appeared pro se on the counterclaim.[32] The hearing addressed pending motions in the Denver Lawsuit and the counterclaim. Donnelly also notified the court that the Koppermans had assigned the judgment of attorney's fees to her for collection purposes.[33] At the conclusion of the hearing, Ms. Kopperman informed the court that she was going to voluntarily dismiss the counterclaim.[34]

Donnelly stated that after the hearing, Respondent approached them in the hallway outside the courtroom and addressed Ms. Kopperman. According to Donnelly, the parties engaged in a heated conversation during which Respondent informed her and Ms. Kopperman that he would not make any payment on the attorney's fees, he would appeal the ruling, and she would "not get a dime out of the attorney's fee award." Donnelly provided compelling testimony that she told Respondent, in front of Ms. Kopperman, that she was representing the Koppermans on the defense of the Denver Lawsuit and that she made it clear to Respondent that he was not to talk to her clients directly about any issue going forward. The conversation ended with a security guard escorting Donnelly and Ms. Kopperman to the parking lot.

On May 15, 2014, Respondent filed a motion to reconsider the court's order of dismissal.[35] The next day, the Koppermans filed pro se a motion to dismiss their counterclaim against NLO.[36] At this stage of the litigation—when all that remained at issue was the resolution of the award of attorney's fees—Donnelly believed there was no longer a legitimate reason for Respondent to directly communicate with the Koppermans.

### Respondent's First Direct Communication with the Koppermans

On May 16, 2014, Respondent emailed the Koppermans.[37] He did not include Donnelly on the email, nor did he seek her permission before sending it. According to Donnelly, when she eventually received this email from the Koppermans she was shocked because she had not consented to the communication.

The subject line of Respondent's email read "Settlement offer." [38] Attached to the email was a four-page letter addressed to the Koppermans bearing the subject line of "NLO v. Kopperman, *et al.* Settlement Discussion Offer, Protected by C.R.E. 408 from

25. Ex. 45 at 0232.

26. Ex. 50.

27. Ex. 50.

28. Ex. 53.

29. *See* Ex. 51 and 53.

30. Ex. 51 at 0249–50.

31. Ex. 54.

32. Ex. A at 1.

33. Ex. A at 14–15.

34. Ex. A at 15–16; Ex. 58.

35. Ex. 59.

36. Ex. 60.

37. Ex. 107.

38. Ex. 107.

disclosure to the court or public."[39] In the letter, Respondent offered to pay the Koppermans $2,000.00 in exchange for a stipulated order dismissing with prejudice the entire lawsuit pending between them, including the *"claims for attorney's fees and costs filed in this Litigation,"* and releasing, on behalf of their assigns, all claims.[40]

As part of the offer, Respondent asked the Koppermans to agree to file a stipulation to vacate all orders previously entered by the court (e.g., the attorney's fees) and to remove their internet reviews.[41] Respondent agreed to sign the settlement agreement "individually, as both an attorney and as owner of Neighborhood Law Office."[42] At the bottom of the letter were signature lines for the Koppermans, Respondent, and NLO.[43] Respondent stated that he agreed to settle individually as an "inducement to them to try to get [the Koppermans] to talk settlement" and that he intended by this letter to settle all of the claims, including the $16,080.00 award of attorney's fees.

After reviewing this email, Ms. Kopperman testified that she thought Respondent was asking her to give up all of her rights but that he "could still come after" her or her children. She did not understand what Respondent meant by offering to be an individual party to the settlement. Mr. Kopperman testified that he did not "one hundred percent" understand Respondent's offer. He thought Respondent was trying to "make loopholes," and he was scared for his children because Respondent mentioned heirs and successors. He was afraid that Respondent would "go after" his children if he could not pay what Respondent demanded. He also wanted to reject the offer because accepting it would "dishonor his agreement" with Donnelly—the one person who had helped defend him.

According to Donnelly, when the Koppermans received Respondent's letter, there was

"zero doubt" that she represented them. She believed that her clients needed advice about this settlement offer because they did not understand that the effect of the settlement would have been to reduce the $16,080.00 attorney's fee award, which she had been assigned, to $2,000.00.

On May 20, 2014, Donnelly responded to Respondent's motion to reconsider.[44] In her response, Donnelly notified the district court that Respondent had contacted her clients ex parte, asking them to settle the case.[45] She included the following language:

> Finally, [Respondent's] request to amend the Complaint is in bad faith and was used to pressure and manipulate the Koppermans to settle the case. The day after [Respondent] filed this motion seeking leave to amend the Complaint (which was after the Koppermans dismissed their counterclaims against [Respondent] without prejudice), knowing that the Koppermans are represented by the undersigned counsel, knowing that the Koppermans have assigned the judgment for fees to the undersigned counsel, without the undersigned counsel's consent, without an authorization by law or the Court, and in violation of Rule 4.2 of the Rules of Professional Conduct, [Respondent] contacted the Koppermans, pressuring them to settle the case.[46]

Donnelly testified that she wanted to bring the ex parte communications to the court's attention and to make obvious that there was "no question going forward about [Respondent's] inability to contact" her clients.

Respondent, in contrast, testified that Donnelly made a false statement to the court because he was not pressuring or manipulating the Koppermans to settle the case. In fact, he contended that Donnelly's refusal to engage in settlement negotiations "obfuscate[d] and confuse[d]" the proceedings, making it impossible for him to discuss set-

---

**39.** Ex. 107 at 0464.

**40.** Ex. 107 at 0464, 0466 (emphasis added).

**41.** Ex. 107 at 0465.

**42.** Ex. 107 at 0465.

**43.** Ex. 107 at 0467.

**44.** Ex. 61.

**45.** Ex. 61 at 0280.

**46.** Ex. 61 at 0280.

tlement with the Koppermans "even though [Donnelly] was not representing them as to the settlement." He did not interpret Donnelly's response as an indication that she was representing the Koppermans for anything outside the motion to dismiss. According to Respondent, this was evidenced by the fact that Donnelly did not expressly inform the court in her response that she was "in this case to settle it" but "instead state[d] that her limited representation [was] for the judgment for fees. That's it. She [didn't] say settlement. She [didn't] say that [she's] changed [her] limited representation."

The day after Donnelly filed her response, Respondent submitted an amended complaint dropping the breach of contract claim but adding an additional claim against the Koppermans based upon an alleged October 2013 defamatory internet review.[47] Donnelly moved to strike the amended complaint the same day.[48]

Donnelly and Ms. Kopperman appeared at a status conference on July 2, 2014, after which the court denied Respondent's motion to reconsider its order of dismissal and his request to file an amended complaint.[49] Also on that day, the court granted the Koppermans' motion to dismiss their counterclaim and their request to supplement Donnelly's affidavit of attorney's fees.[50] On July 14, 2014, Donnelly requested an additional $6,390.00 in attorney's fees.[51]

### Respondent's Second Direct Communication with the Koppermans

On July 23, 2014, Alexandra Johnson, a law clerk at NLO, sent an email directly to the Koppermans.[52] The email contained another offer of settlement regarding the Denver Lawsuit.[53] The letter attached to the email was dated May 22, 2014, was addressed to the Koppermans, and was signed by Respon-

dent.[54] The Koppermans testified that they did not receive this letter until July 23. As relevant here, the letter contained the following language:

I am writing to you directly about settlement because I understand that your attorney entered a limited appearance which does not include dealing with settlement negotiations. Moreover, your attorney stated in open court that she will not be involved in any settlement negotiations. If I am in error about my understanding, please send this letter to your attorney and have that person contact me.

I heard Mrs. Kopperman at the May 8 hearing when she said that you just wanted the litigation to stop. I was then shocked by your attorney standing up after Mrs. Kopperman's comments and declaring that there 'will be no settlement.' That statement was a clear and unequivocal statement of a conflict of interest on her part. She clearly has an interest in the case which she believes trumps your right to end the litigation. This is a matter about which you should obtain independent counsel.

. . .

Your attorney, when she took ownership of the fee award created a conflict of interest which cannot be waived.

. . .

Therefore, while your primary interest is to get out of the litigation in good shape, your attorney's primary interest is not settling the current lawsuit because that might impair her ability to receive payment from the fee award.

. . .

If your attorney did not, in writing, counsel you to obtain independent legal advice before entering into an agreement to give her the fee award, then her conduct was unethical.

47. Ex. 63.

48. Ex. 64.

49. Exs. 67, 69.

50. Exs. 68–69.

51. Ex. 71. On August 29, 2014, Donnelly requested an additional $9,730.00 in attorney's fees. Ex. 85.

52. Ex. 110.

53. Ex. 110.

54. Ex. 110 at 0481–84.

. . .

NLO cannot afford to stop litigating with you until an agreement is reached concerning both the reviews as well as the dismissal of the instant litigation.

Therefore it appears that NLO will have to file a new lawsuit. I have completed drafting of the new complaint. Let me know if you will accept service, or whether I should use a process server.[55]

Ms. Kopperman testified that this letter was untruthful because Donnelly had never stated in open court that she would not be involved in settlement. She felt that Respondent was "trying to run off" her attorney. Likewise, Mr. Kopperman viewed this letter as an attempt to create a division in his marriage and with Donnelly. He stated that he did not want to settle the case because he did not "trust [Respondent] at his word" and thought that even if they did settle, Respondent would continue to sue his family.

Donnelly testified that she was concerned for a number of reasons after reviewing this letter. Specifically, she was troubled that the letter contained misrepresentations about her statements to the court and represented an attempt by Respondent to redefine her relationship with her clients. She was bothered because Respondent knew "way before this [email] was sent that he [was] not supposed to contact the Koppermans" and because he knew that the Koppermans, as laypeople, did not have the ability to understand he wanted them to drop their claim for fees.

When asked why he sent this email directly to the Koppermans, Respondent contended that his law clerk must have sent it automatically, likely because the May letter had been returned to NLO in the mail. He said he did not contact Donnelly before sending this to the Koppermans because it was "pretty clear that [Donnelly] wasn't going to engage in settlement talks for any reason."

Five days later, on July 28, 2014, Donnelly emailed Respondent. Her email bore the subject line: "Your ex-parte communications in NLO v. Koppermans—13–CV–34780." [56]

She wrote: "This is the third time I am asking you, please direct *all* your communications regarding this case to me, in *writing*." [57] Respondent testified that Donnelly's email misstated the facts of the case and that Donnelly took a "position adverse to her clients that she was not going to permit any settlement negotiations."

Nevertheless, after receiving Donnelly's email, Respondent began to communicate with her about settling the Denver Lawsuit. He testified that he still did not think Donnelly was representing the Koppermans for settlement purposes, but he was corresponding with her to call "her bluff"—a strategy that in his mind was successful since, after he sent her settlement materials, no settlement negotiations took place.

On August 8, 2014, Respondent sent an email to Donnelly, which bore a subject line of "Kopperman Settlement" and stated:

Hi,

You told me to not send the letter I sent to you to your client.

1) Your client's mail came back undeliverable. They are obligated to provide the court and me with their new address.

2) You have not responded to either of the settlement communications. Exactly what are your clients' responses to the various offers contained in the letters?

I look forward to hearing from you.

Thanks, Jim [58]

Donnelly testified that she was confused by Respondent's email because, up to that time, Respondent had made no attempt to engage her in settlement negotiations. In response, Donnelly emailed Respondent on August 10, 2014, stating:

As you know, you have never engaged in proper settlement negotiations with the Koppermans. So far, all your communications regarding settlement have been ex parte communications. And you have been reminded several times to stop these ex parte communications.

55. Ex. 110 at 0481–84.

56. Ex. 111.

57. Ex. 111 at 0485 (emphasis in original).

58. Ex. 112 at 0487–88.

Because you have never sent me a settlement offer there is nothing for me to review. If you would like me to give consideration to an offer of settlement from you you need to send me one.[59]

Respondent emailed Donnelly the next day, attaching four settlement letters, two of which—those dated May 15 and 22, 2014—the Koppermans had previously received.

The third letter was dated July 28, 2014, and was addressed to Donnelly.[60] Donnelly testified, however, that she did not receive this letter in July.[61] In the letter, Respondent told Donnelly that she had "not requested that [he] refrain from communicating directly with [her] clients regarding settlement or any other issue prior to [July 28, 2014]."[62] He then admitted to addressing communications directly to Donnelly's clients because her "entry of appearance was limited to 'filing a motion to dismiss.' It has not been updated or expanded."[63] He went on to inform Donnelly that she had a "clear and unequivocal conflict of interest when it comes to the issue of [her] client's desire to end this case and avoid a new case."[64] He further indicated that NLO planned to file a new lawsuit against the Koppermans.[65] He proposed to settle the Denver Lawsuit and to settle any new lawsuit before it was filed.[66] Donnelly testified that she interpreted this email as one more attempt to redefine the scope of her attorney-client relationship with the Koppermans.

The fourth letter was dated August 11, 2014, and was also addressed to Donnelly.[67] In this letter, Respondent said that Donnelly was "confused about the meaning of a limited appearance by counsel."[68] He asserted that

her limited appearance "ended quite some time ago."[69] He then reiterated his belief that Donnelly was preventing settlement negotiations by "somehow convincing [her] clients that they cannot settle this case" and again threatened to file a second lawsuit.[70]

On August 20, 2014, Donnelly emailed Respondent, notifying him that "[t]he Koppermans are not interested in a settlement negotiation with you at this time."[71] She then clarified in a second email that the Koppermans did not find the email dated August 11, 2014, "an acceptable offer and, as a result, [were] not interested in a settlement negotiation based on it" but that they remained "open to a reasonable settlement offer."[72] Respondent testified that he believed this email was disingenuous, so he stopped trying to negotiate with Donnelly.

The next day, Respondent responded to Donnelly's email, charging her with "blocking settlement negotiations because of [her] unwaiveable [sic] conflict of interest."[73] He said he found it "impossible to believe that [her] client's [sic] do not want to talk about avoiding a second lawsuit," and he implored her to "either expand [her] limited appearance, or [he would] resume dealing directly with [her] clients regarding settlement who remain pro se on all issues except the motion to dismiss."[74] Donnelly testified that because this email was intimidating, she did not respond.

### Judgment for Attorney's Fees

The court held a hearing on the motion for

59. Ex. 113 at 0490–91.

60. Ex. 113 at 0501–03.

61. *See* Ex. 113 at 0489; Ex. 116 at 0520–21.

62. Ex. 113 at 0501.

63. Ex. 113 at 0501.

64. Ex. 113 at 0501.

65. Ex. 113 at 0502.

66. Ex. 113 at 0502.

67. Ex. 113 at 0504–06.

68. Ex. 113 at 0505.

69. Ex. 113 at 0505.

70. Ex. 113 at 0505.

71. Ex. 116 at 0520–21.

72. Ex. 116 at 0520–21.

73. Ex. 116 at 0519.

74. Ex. 116 at 0519–20.

attorney's fees on August 29, 2014.[75] Donnelly appeared on behalf of the Koppermans.[76] The court found in favor of the Koppermans and directed Donnelly to prepare the order.[77] On September 18, 2014 (*nunc pro tunc* to August 29, 2014), the court entered judgment in favor of the Koppermans and against NLO in the amount of $32,200.00 plus interest, representing Donnelly's fees to that date.[78] Donnelly initiated a writ of garnishment against NLO for this amount on September 24, 2014.[79] She then filed a motion to enter judgment against Respondent and his wife, as owners of NLO.[80]

### Respondent's Third Direct Communication with the Koppermans

On October 5, 2014, Respondent once again directly communicated with the Koppermans by email without Donnelly's consent.[81] The subject line of this email read "Settlement of Denver and new Arapahoe County Lawsuits."[82] At that time, however, there were no new pending lawsuits in Arapahoe County: Respondent attached a letter to the email, in which he again attempted to persuade the Koppermans to settle the Denver Lawsuit without involving Donnelly in the discussions. He then threatened to file a second lawsuit, stating that "[i]t is time to deal with the defamatory internet postings which you made and which were not part of the Denver District Court case.... Please find attached a new complaint concerning these postings."[83] He asked the Koppermans to waive service of the new complaint, stating, "If you sign and return the waiver [of] service to me then I will not have to have you served by a deputy sheriff or process server."[84]

Also in the letter, he informed the Koppermans that he would be willing to settle with "the two of you one at a time" and continued to press the issue of settlement of the Denver Lawsuit:

I have previously discussed my opinion that all judgments entered to date belong to the parties, not their attorneys. I have also discussed my opinion that it is unethical and a conflict of interest for an attorney to block settlement when his clients desire to settle the case. Finally, I have previously discussed my opinion that absent a written contingent fee agreement an attorney cannot lawfully demand payment of a fee. Finally, an attorney cannot settle a client's case. It is my opinion that only the party can agree to the terms to settle their case.[85]

He then offered to pay for an independent attorney to review the proposed settlement documents:

I understand that money may be tight. Toward that end I previously offered to pay the fee to permit you to obtain independent counsel to advise you regarding entering into a settlement agreement with the firm. You pick your own attorney; I have no interest in which you pick. I will then pay that attorney up to $800 for his or her advice to you. Of course, the person would be your attorney and I would not be privy to any discussions you have with that attorney. However, there is one caveat:, the attorney cannot be Ms. Donnelly or connected either personally or professionally to Ms. Donnelly.

As you know, I have also offered a cash settlement payable to you to settle the litigation. Of course, that money would be

75. Ex. 84.

76. Ex. 84.

77. Ex. 84.

78. Ex. 90. In its order, the court awarded the Koppermans an additional $16,120.00 in supplemental fees.

79. Ex. 91.

80. Ex. 92.

81. Ex. 117.

82. Ex. 117 at 0524.

83. Ex. 117 at 0525–26.

84. Ex. 117 at 0525.

85. Ex. 117 at 0526.

yours to do with as you please.[86] Respondent acknowledged that he did not seek Donnelly's consent before sending the email, reasoning that she would not be involved in the Arapahoe County case, even though he had not been so informed by the Koppermans or by Donnelly.

Ms. Kopperman testified that she viewed the October 5 email as a threat: either she settled with Respondent or he would sue her in another county. She directly responded that same day, objecting to his ex parte communications.[87] She directed Respondent to "[p]lease forward all communications to my attorney, Katy Donnelly."[88] She also said:

> I believe our lawyer has made it exceptionally clear that my husband and I reject ALL of your settlement offers. To imply otherwise again simply shows your unethical behavior and ways. I'm telling you personally the same thing our lawyer has told you multiple times—WE reject ALL your settlement offers. Is that CLEAR enough?[89]

She demanded that Respondent refrain from "personally contact[ing] [her] again without cc'ing [her] attorney on file," reiterating that he has "been notified to [copy Donnelly] multiple times."[90] Ms. Kopperman testified that she sent this response to Respondent because she had told him "multiple times to stop contacting [her] and [her] husband" and to "run everything through [their] lawyer" but he refused to do so. She wanted Respondent to hear from her directly that they were not interested in any settlement or negotiations.

### Subsequent Developments

Respondent has appealed the Denver district court's award of attorney's fees, and the Koppermans are appearing pro se in that appeal.[91] Respondent filed a second lawsuit against the Koppermans on November 12, 2014, in Arapahoe County District Court case number 2014CV32965. Ms. Kopperman stated that Donnelly is not representing them in the Arapahoe County case because she has not been paid for her work on the Denver Lawsuit.

### IV. ANALYSIS

■ The People ask the Court to revoke Respondent's probation, asserting that Respondent violated Colo. RPC 4.2 by repeatedly contacting the Koppermans to propose settling the Denver Lawsuit, even though he knew that they were represented by Donnelly for this purpose. For his part, Respondent contends that he did not violate Rule 4.2 because Donnelly never expanded the scope of her limited representation beyond filing a motion to dismiss either in a court filing or in an express statement to him. Therefore, according to Respondent, the subject matter of his settlement communications was not off-limits. Finally, Respondent maintains that even if Donnelly's scope of representation could be considered as encompassing settlement, he had no knowledge of this expanded scope of representation.

Colo. RPC 4.2 mandates that a lawyer "shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." Rule 4.2 does not prohibit an attorney from communicating with a represented person about something other than the subject matter of the representation.[92] The purpose of this longstanding rule is "to protect[] a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the attorney-client relationship and the uncounselled disclosures of information relating to

---

**86.** Ex. 117 at 0526.

**87.** Ex. 119.

**88.** Ex. 119 at 0533.

**89.** Ex. 119 at 0533.

**90.** Ex. 119 at 0533.

**91.** Ex. B.

**92.** Colo. RPC 4.2 cmt. 4.

the representation." [93]

The inquiry for the Court is twofold: (1) whether Respondent's communications with the Koppermans pertained to the subject matter on which Donnelly represented them, and (2) whether Respondent knew that Donnelly represented them on the matter.[94]

In this inquiry, the Court considers not only Colo. RPC 4.2 but also the legal authorities governing limited representations. Colo. RPC 1.2(c) permits attorneys to provide limited representation to pro se parties in court proceedings pursuant to C.R.C.P. 11(b).[95] An attorney's limited representation under C.R.C.P. 11(b) does not, however, constitute an entry of appearance by that attorney for all purposes under C.R.C.P. 121 section 1–1.[96] But if the attorney represents the pro se party at any proceeding before a judge, such action constitutes an entry of appearance.[97] Upon the request and consent of the pro se party, an attorney may make a limited entry of appearance in a specific proceeding by filing with the court and serving on opposing parties a notice of the limited appearance.[98] At the conclusion of the proceeding, the attorney's limited appearance is terminated without leave of court when the attorney files a notice of completion of limited appearance.[99]

### The Subject Matter of Donnelly's Representation

The Court finds proof by a preponderance of the evidence that Donnelly was representing the Koppermans for the purposes of settling the Denver Lawsuit. It is undisputed that Donnelly represented the Koppermans on their motion to dismiss NLO's claims in the Denver Lawsuit. The court dismissed all of NLO's remaining claims on March 13, 2014. Because the Koppermans prevailed on their motion to dismiss, Donnelly then filed a

series of motions related to statutory attorney's fees. Donnelly testified that she saw no need to file a notice expanding her limited representation because the proceedings had never advanced past .the motion-to-dismiss phase. The court awarded the Koppermans attorney's fees of $16,080.00 on April 21, 2014, and an additional $16,120.00 in fees on August 29, 2014. Because C.R.S. section 13–17–201 mandates an award of attorney's fees when a trial court dismisses an action under C.R.C.P. 12(b), the award of Donnelly's fees was a direct result of the motion to dismiss.[100] As of May 8, 2014, the Koppermans had assigned Donnelly the fee award for collection, and Donnelly had begun filing affidavits and motions in support of those fees. Thus, the Court finds that settlement of the fees, which Donnelly clearly had an interest in and was charged with collecting, was well within the scope of her limited representation.

There is also no question that Respondent communicated directly with the Koppermans on three occasions about settling the Denver Lawsuit after NLO's claims had been dismissed and the Koppermans had been awarded attorney's fees. The Court considers each communication in turn.

First, Respondent's email dated May 16, 2014, encouraged the Koppermans to settle the Denver Lawsuit. Respondent testified at the hearing that it was his intention with this email to settle the Kopperman's claim for attorney's fees. Respondent contends that this email was proper. He said he did not call Donnelly directly to discuss settlement because she had told him that she wanted all communications in writing and that she would not entertain an offer of settlement. According to Respondent, Donnelly and her clients had "made clear" that hers was a limited representation regarding the motion

---

93. *Id.* cmt. 1.

94. It is undisputed that Donnelly did not consent to the communications.

95. *See* C.R.C.P. 11(b) (stating that an "attorney may undertake to provide limited representation in accordance with Colo. RPC 1.2 to a pro se party involved in a court proceeding.").

96. *Id.*

97. *Id.*

98. C.R.C.P. 121 § 1–1(5).

99. *Id.*

100. C.R.S. § 13–17–201; *Kreft v. Adolph Coors Co.,* 170 P.3d 854, 859 (2007).

to dismiss. He interpreted her "silences and refusal to engage in settlement as a confirmation of her limited representation." He thought it "was perfectly clear that [Donnelly] was not in charge of or responsible for settlement negotiations, that her client was the one doing that." According to Respondent, there was "no doubt in [his] mind" that Donnelly's clients were defending the case pro se, save for the motion to dismiss and attorney's fees collection efforts. The Court does not find Respondent's defense persuasive because by May 16, 2014, any settlement would have been inextricably linked with the mandatory award of attorney's fees, which was the only issue left to resolve at this stage in the litigation.

Second, Respondent's July communication discusses the assignment of the fee award to Donnelly, her alleged conflict of interest as a result of the assignment, and her refusal to settle the "fee issue." Respondent explained that he assumed Donnelly's limited representation permitted only her clients to discuss settlement, and he did not think that it would "serve any purpose" or do "any good" to contact Donnelly before sending this communication because, in his opinion, "she wasn't part of this." Respondent stated that he wanted to inform the Koppermans of Donnelly's conflict of interest and to remind them that they had the power to settle the lawsuit. He further justified his conduct by stating:

> [Colo. RPC] 4.2 says you may not talk with somebody who is represented about a particular matter, about that particular matter without their attorney's consent. If [Donnelly] does not represent them, she can tell me not to talk to them all she wants. But [the Rules] say[ ] she has to represent them. She's already told the court, her client has told the court, there are numerous emails where the clients are the ones taking control of their case. They're pro se in this case. She has entered a limited appearance for a limited item. And she never, ever, in open court or anywhere else, said, I'm now in charge of settlement, I'm now in charge of every issue. In fact,

she said the opposite. So my thought process was, this was a[n] affirmative attempt by an attorney to block any settlement communications where she did not have a right to do so.

Again, Respondent's defense fails. As discussed above, the only pending claim subject to settlement was the court's award of attorney's fees because NLO's claims had been dismissed as had the Koppermans' counterclaim.

The subject matter of Respondent's October 5 email also addresses the possibility of settling the Denver Lawsuit, including fees, and Donnelly's alleged conflict based on the attorney's fees assignment. Respondent testified that he did not seek Donnelly's permission before sending the October 5 email because he still believed that she was not "representing them on the settlement" and that "she was playing cute. She had a limited representation, she was going to stand by her limited representation, at the same time she, for her own purposes, was going to block any attempt at settlement."

The Court again finds Respondent's defense to be casuistic and without merit. At the time Respondent sent the October email, the only issue left to resolve was the attorney's fees and the collection of the fees. Respondent concedes that Donnelly's representation included the related fee award and the collection of the award.[101] Accordingly, any of Respondent's efforts to settle the case could only have been directed to settling the award of attorney's fees, which necessarily entwined with Donnelly's attempts to collect these fees on the Koppermans' behalf.

But even if Respondent's analysis were correct, and Donnelly's initial limited appearance failed to encompass settlement of attorney's fees—the only remaining issue in the case by May 2014—several other independent bases support a finding that Donnelly's representation had expanded since that filing. First, Donnelly's representation included settlement when the

---

101. *See* Respondent's Closing Arg. at 1 ("Ms. Donnelly's representation was limited to the motion to dismiss and its related fee award which [sic] all believed to be the same issue."); *see also* Respondent's Closing Arg. at 3 ("It is clear that the Kopperman's [sic] were *pro se* on the counter-claim and Ms. Donnelly's only interest in the attorney's fees was for collection purposes.").

Koppermans formed the belief that Donnelly was representing them in the Denver Lawsuit, including settlement, which they later told Respondent.[102] Second, even if the Koppermans' subjective beliefs were insufficient to expand the scope of Donnelly's representation, Donnelly made it abundantly clear to Respondent throughout the Denver Lawsuit, as discussed in detail below, that she was representing the Koppermans on settlement. Respondent was not entitled to unilaterally redraw the boundaries of that representation or to refuse to accept Donnelly's admonitions. Finally, Donnelly appeared at three status conferences before the court while representing the Koppermans, the first of which took place on March 28, 2014. Under C.R.C.P. 121 section 1–1, these appearances constituted an entry of appearance for the Koppermans, thereby enlarging Donnelly's participation into a general representation. Because all of Respondent's ex parte communications with the Koppermans took place after Donnelly appeared in court for the Koppermans, the Court concludes that Respondent's communications pertained to a subject matter on which the Koppermans were represented.

### Respondent's Knowledge of Donnelly's Representation

Where a lawyer knows a party is represented, the lawyer must obtain consent of the party's lawyer to communicate directly with the party.[103] Comment 8 to Colo. RPC 4.2 defines knowledge as actual knowledge but explains that such a mental state may be "inferred from the circumstances."[104] A pro se party who has obtained the limited representation of counsel under C.R.C.P. 11(b) is considered to be unrepresented under Rule 4.2 unless the opposing lawyer "has knowledge to the contrary."[105] A lawyer may not ignore clear indications that a person is rep-

resented by "closing [her] eyes to the obvious."[106] Thus, willful blindness is not a defense.

The Court concludes that the People have proved by a preponderance of the evidence that Respondent knew the Koppermans were represented by Donnelly for settlement purposes when he sent ex parte communications to the Koppermans in May, July, and October 2014.

As an initial matter, Respondent should have known that Donnelly represented the Koppermans after their hallway meeting on May 8, 2014. There, Donnelly informed Respondent that she was representing the Koppermans on all issues going forward and that he should direct all communications in writing to her. Respondent also knew as of this date that the fees had been assigned to Donnelly and that she was making efforts to collect them on behalf of the Koppermans. But a mere twelve days later, Respondent ignored Donnelly's express instructions and sent an email directly to the Koppermans asking them to release their claims for attorney's fees on behalf of their assigns, i.e., Donnelly.

Even if Respondent were confused about the scope of Donnelly's representation after their meeting on May 8, 2014, the Court would have no trouble inferring that Respondent knew Donnelly represented the Koppermans for purposes of settlement after May 20, 2014, based on Donnelly's notification to the court on that date complaining about Respondent's ex parte contacts. In this notification, Donnelly indicated that Respondent had attempted to settle the case even though he knew that she was representing the Koppermans and that she had been assigned the attorney's fees. Although she does not expressly state that she was "in the case to settle it," as Respondent demanded, Donnelly nevertheless made quite clear that she was

---

102. *People v. Bennett,* 810 P.2d 661, 664 (Colo. 1991) (holding that an important factor in ascertaining whether an attorney-client relationship has been established is the subjective belief of the client).

103. Colo. RPC 4.2.

104. *See also* Colo. RPC 1.0(f) ("'Knowingly,' 'known,' or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances.").

105. Colo. RPC 4.2 cmt. 9.

106. *Id.* cmt. 8.

representing the Koppermans for settlement purposes.

By July 2014, Respondent affirmatively knew that Donnelly was representing the Koppermans for settlement purposes. In response to Respondent's July 23 offer of settlement, Donnelly emailed Respondent and explicitly told him to "direct all [of his] communications regarding this case to [her], in writing." [107] This email unequivocally informed Respondent that Donnelly was representing the Koppermans for settlement purposes.

Later communications between Respondent and Donnelly provide additional evidence of Respondent's actual knowledge of the inclusive scope of Donnelly's representation. For example, Donnelly emailed Respondent on August 10, 2014, ordering him to discontinue his ex parte communications regarding settlement with the Koppermans and inviting him to send her a settlement offer for consideration. Respondent then acknowledged Donnelly's representation when he sent her four letters pertaining to settlement on August 11, 2014. In one of those letters, Respondent recognized that at least by July 28, 2014, Donnelly had directed him to stop communicating with the Koppermans about settlement. Then on August 20, Donnelly told Respondent to send her reasonable settlement offers, once again alerting him that she was representing the Koppermans for settlement purposes.

Clearly unhappy with the Koppermans' refusal to settle, however, Respondent deliberately chose to ignore Donnelly's instructions. On October 5, 2014, he made yet another attempt to persuade the Koppermans to settle their claims for fees without the advice of counsel. In this letter, he also threatened to file a second lawsuit against them if they did not settle, characterizing the scope of their relationship with Donnelly in a way that supported his attempts to ignore Rule 4.2.

Rather than following the Rules of Professional Conduct and seeking Donnelly's consent to communicate with the Koppermans about settlement, Respondent repeatedly and deliberately ignored all indications—not to mention all express advisements—that Donnelly was representing the Koppermans for settlement purposes. To serve his own interests, Respondent unilaterally attempted to narrowly define the scope of Donnelly's representation, closing his eyes to obvious evidence of the actual scope of her representation.

In short, Respondent had actual knowledge that Donnelly was assisting the Koppermans with settlement yet purposely ignored his obligations under Colo. RPC 4.2. He failed to seek Donnelly's consent to communicate directly with the Koppermans regarding settlement of the attorney's fees, even though he knew Donnelly was representing them on this matter. The Court finds that Respondent's direct contact with the Koppermans was designed to deprive them of the advice of their retained counsel, contrary to the goals of Rule 4.2.[108] Respondent should be not free to "exploit the presumably vulnerable position of a represented but unadvised party." [109]

## V.  CONCLUSION

■ Based upon the foregoing analysis, the Court concludes that the People have met their burden of establishing by a preponderance of evidence Respondent's violation of a condition of probation. As such, it is appropriate to revoke Respondent's probation and activate his suspension.

## VI.  ORDER

The Court therefore **ORDERS**:

1. Respondent's two-year period of probation is **REVOKED.**

2. The stay on Respondent's three-month-and-one-day suspension is **VACATED.**

3. **JAMES C. UNDERHILL JR.,** attorney registration number **15836,** is **SUSPENDED** from the practice of law

---

**107.**  Ex. 111 (emphasis omitted).

**108.**  *See Carter v. Kamaras,* 430 A.2d 1058, 1059 (R.I.1981).

**109.**  N.Y. City Bar, Formal Op. 263 (1996) (quoting Charles W. Wolfram, *Modern Legal Ethics* (1986)).

for **THREE MONTHS AND ONE DAY.** The **SUSPENSION SHALL** take effect on **Monday, June 29, 2015.**

4. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

5. Respondent **SHALL** file with the Court, **within 14 days** of the effective date of the suspension, an affidavit complying with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the Court setting forth pending matters and attesting, inter alia, to notification of clients and of other jurisdictions where the attorney is licensed.

6. Should Respondent wish to resume the practice of law after serving his suspension, he must file a petition for reinstatement pursuant to C.R.C.P. 251.29(c).

